FILED

2021 May-03  PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **ROBERT SNODGRASS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | |
| | ) | _____ |
| **THE PRUDENTIAL** | ) | |
| **INSURANCE COMPANY OF** | ) | |
| **AMERICA,** | ) | |
| | ) | |
| **Defendant.** | | |

## COMPLAINT

**COMES NOW**, the Plaintiff, Robert Snodgrass, and in support of his

Complaint says as follows:

## FACTS COMMON TO ALL COUNTS

1.      The Plaintiff is a resident of Alabama.

2.      The Defendant, The Prudential Insurance Company of America (hereafter

"Prudential"), is, upon information and belief, a foreign corporation that does

business by agent or otherwise in the State of Alabama and provided a long-term

disability policy of insurance for employees of Warrior Met Coal, Inc. (hereafter

"Warrior Met"), at all times relevant to this Complaint.

3.      The Plaintiff worked for Warrior Met as a mine general foreman.

4.      The Plaintiff was a participant in a long-term disability plan, which was underwritten by the Defendant.

5.      The Defendant does business by agent in the Northern District of Alabama and all other counties in the State of Alabama.

6.      The Plaintiff's job required him to supervise, coordinate and schedule all activities of mine operations personnel.

7.      His job was very demanding and fast-paced, requiring him to work twelve (12) hour shifts, approximately five (5) to six (6) days a week.

8.      The specific requirements of the Plaintiff's job related to supervising, coordinating, and scheduling the activities of all mine operations personnel included the following:

   (a) Providing leadership to all mining activities, ensuring work is being completed in a safe, efficient and timely manner.

   (b) Controlling all allocated labor to ensure maximum availability of resources by managing absenteeism and taking corrective action where applicable.

   (c) Supervising, training, and developing assigned team members as required.

   (d) Establishing good working relationships with other departments.

9.      The Plaintiff was also required to engage in production, efficiency, and cost control by performing the following tasks:

   (a) Coordinating equipment usage to ensure efficient and effective achievement of operational objectives.

(b) Analyzing equipment rates and making changes to daily operational plans as necessary, based on mining conditions.

(c) Ensuring achievement of production targets by maintaining operational objectives.

(d) Ensuring all administrative data for the operations is generated accurately and in a timely manner, including all equipment and personnel time sheets and log books as well as daily diaries and production reports as required.

(e) Ensuring that all records on equipment utilization (i.e., hours, pre-start checklists and utilized hours, are recorded on a daily basis.)

(f) Reporting performance breakdown, equipment damage, safety near misses, incidents and accidents according to established procedures.

(g) Implementing daily, weekly and monthly operational plans and objectives, in accordance with production plan requirements.

(h) Assessing employee performance against objectives on a regular basis as per Company policy and take corrective action where required.

(i) Implementing and maintaining operating procedures to ensure safe and effective operation of the mine.

(j) Implementing actions to optimize mining process performance and attaining efficiency targets in the areas of: labor productivity, equipment availability, utilization, and material consumption.

(k) Participating actively with the technical services group to support the development of optimum mining short and long-term plans.

(l) Developing and implementing area work ownership with resources to maintain appropriate balance of workload with priority to equipment availability.

(m) Investigating accidents and near misses with a view toward positive action, emphasis on prevention through training, equipment set-up equipment repair and report on findings and conclusions.

(n) Identifying haul roads and dumpsites that need repair and ensure deviations are rectified.

10.     The Plaintiff has a long history of lumbar problems. While working in the mines in 2008, he fell from a pump and ruptured a disc in his back.

11.     Over the next several years, the Plaintiff attempted conservative treatment, which included prescription medications, injections, and physical therapy. However, in 2015, after conservative treatment failed to alleviate his pain, the Plaintiff underwent a microdiscectomy.

12.     The Plaintiff experienced improvement in his pain following surgery but continued to suffer from chronic pain, nonetheless.

13.     Then, in April 2018, again while working in the mines, the Plaintiff's back gave out and some of his co-workers had to take him out of the mines.

14.     The Plaintiff left work to seek further medical treatment.

15.     In an office visit note from April 19, 2018, his orthopedist, Martin P. Jones, M.D., noted that the Plaintiff reported back and left leg pain, specifically, pain radiating down into the top of his foot with numbness along the top of his foot.

16.     Dr. Jones also noted findings from the Plaintiff's recent lumbar Magnetic Resonance Imaging (MRI) reflecting a recurrent disc herniation at L4-5. Examination findings of the Plaintiff confirmed lumbar tenderness to deep palpation, decreased lumbar range of motion, a positive straight leg raise, and decreased sensation along the dorsal aspect of the left leg.

17.    Due to the Plaintiff's chronic symptoms and diagnostic and physical examination findings, Dr. Jones recommended that he undergo a second microdiscectomy, which was performed on May 17, 2018.

18.    In the operative report from the Plaintiff's second surgery on May 17, 2018, Dr. Jones noted the following: "There was extensive scarring from the previous surgery."

19.    Initially, the Plaintiff's pain improved following surgery. His first couple of post-surgical follow up visits noted his improvement.

20.    Dr. Jones recommended that he undergo physical therapy again which also seemed promising initially with assisting the Plaintiff in his recovery.

21.    Unfortunately, by the Plaintiff's September 6, 2018 follow-up visit, his leg had begun hurting again. The Plaintiff reported that he had gotten worse after beginning his work conditioning program.

22.    He underwent a lumbar MRI on September 28, 2018, which revealed no neural impingement since his surgery in May, but chronic loss of height of the superior plate of L3 was noted, as well as some disc desiccation at L3-4, L4-5, and L5-S1.

23.    In his follow up visit on October 23, 2018, Dr. Jones noted that the Plaintiff felt miserable and could not go for thirty (30) minutes of activity without stopping. Therefore, he recommended an epidural block.

24.     Despite further attempts to relieve his pain, the Plaintiff continued to suffer debilitating, residual pain which did not improve over the next several months.

25.     Additionally, he had begun taking narcotic pain medication which resulted in more harmful than beneficial effects. Specifically, the Plaintiff was disoriented and to some degree, more dysfunctional when taking the medication. Eventually, he had to detox from his medications which resulted in improvement of his functionality mentally though his pain persisted.

26.     Within a few months after his appointment on October 23, 2018 with Dr. Jones, the Plaintiff returned due to continued back and hip pain.

27.     In an office visit note from May 2, 2019, the Plaintiff was noted to exhibit tenderness around his surgical scar and paraspinal muscles of the lumbar spine. He also exhibited decreased range of motion.

28.     Due to his ongoing symptoms despite two (2) surgeries, Dr. Jones noted his belief that the Plaintiff suffered from post-laminectomy syndrome.  Dr. Jones advised the Plaintiff that a fusion could possibly help relieve his pain but there were risks with undergoing this procedure.

29.     Because the Plaintiff was in so much pain and had no other options, he scheduled his third surgery. However, due to a move in his location and transportation difficulty, he could not attend the surgery as scheduled in June 2019.

30.     Further, because the Plaintiff was required to get approval from his worker's compensation case manager for all treatment, he had to wait a significant period before he could obtain a new doctor in his new location.

31.     While pending approval to receive further treatment for his condition, the Plaintiff's long-term disability claim, which had been approved by Prudential from the outset of his disability, was terminated around July 2020.

32.     The Plaintiff's condition had not improved; however, Prudential terminated his claim based on findings from a Functional Capacity Evaluation (FCE) in 2018.

33.     Specifically, Prudential contended that the Plaintiff could perform jobs of a sedentary to light physical demand level as of October 3, 2020, the beginning of the 'any occupation' period of disability.

34.     Prudential ignored the debilitating nature of the Plaintiff's pain, despite his two (2) lumbar surgeries, which were performed to relieve his pain and not just to correct his herniated discs.

35.     The Plaintiff appealed Prudential's decision to terminate his claim on January 26, 2021. Among the evidence presented in support of his appeal, was a recent lumbar MRI from January 19, 2021, which revealed further disc generation, including loss of disc height and facet arthritic change contributing to moderate left sided neuroforaminal stenosis at the L4 and L5 nerve root levels. Other abnormal findings included the following:

**L3-4: Disc desiccation and a high signal annual fissure between the 5 and 6:00 positions, associated with a central and left paracentral disc protrusion producing thecal sac deformity and compressing the left L4 nerve root in its lateral recess**

**L4-5: Disc desiccation worse on the left than the right, facet arthropathy, loss of disc height and facet arthritic change contributing to moderate left-sided neuroforaminal stenosis at the L4 nerve root level**

**L5-S1: Disc desiccation noted, high signal annular fissure present at 5:00 position, broad-based disc bulge at the lumbosacral junction, loss of disc height and facet arthritic change contributing to moderate left-sided foraminal stenosis at the L5 nerve root level**

36.     In addition to the Plaintiff submitting the further abnormal MRI findings noted above, he also submitted a signed declaration from occupational medicine physician, Robert L. Ross, III, M.D., MPH.

37.     Dr. Ross rendered medical opinions regarding the Plaintiff's condition based on his review of the Plaintiff's medical records. Specifically, he noted that the debilitating, residual nature of the Plaintiff's pain was supported by his medical history and the medical records, including his recent, abnormal MRI findings.

38.     Dr. Ross also explained that chronic, residual pain can occur in situations like the Plaintiff's, due to scarring around the nerve roots during the healing process. This can result in temporary relief of residual pain, however, when further entrapment develops, pain can eventually become permanent.

39.     Dr. Ross confirmed that the Plaintiff's medical history was consistent with failed back surgery syndrome (FBSS), as his orthopedist noted after his second lumbar surgery. He stated further that this condition itself is marked by severe pain and is a chronic pain syndrome often resistant to treatment, including further surgery, especially where permanent nerve damage has occurred.

40.     Dr. Ross noted further the risk of increased pain with further surgery.

41.     Dr. Ross described the Plaintiff's condition as fairly complex, given his extensive history and the noted pathological findings/changes, particularly with his most recent MRI.

42.     Despite notations in the Plaintiff's physical therapy records indicating he showed up late for sessions, Dr. Ross stated that this was not unexpected given the severity of the Plaintiff's pain. He also pointed out that the Plaintiff was noted to be in pain when he arrived for some of his sessions.

43.     Also, the Plaintiff had undergone physical therapy previously and the examination findings noted in his physical therapy records supported his pain reports, further indications that the Plaintiff was not malingering.

44.     Dr. Ross explained further that, while the Plaintiff's physical functionality was an issue regarding his disability, the distraction of his pain was a critical reason he could not work. Dr. Ross stated that patients like the Plaintiff who are put in a

situation of trying to work while controlling debilitating pain experience increased

stress levels which negatively impact their mental and physical well-being.

45.     Despite the Plaintiff pointing out in his appeal the debilitating nature of his

pain, Prudential solicited medical opinions from a physical medicine and

rehabilitation physician, Behzad Emad, M.D., to refute/ignore the Plaintiff's medical

history and his recent lumbar MRI findings and, instead, cling to findings from Mr.

Snodgrass' 2018 FCE.

46.     Specifically, Dr. Emad concluded that the Plaintiff could return to full-time

employment based on the FCE findings, despite the staleness of these findings.

47.     Dr. Emad also supported his opinions based on the Plaintiff's inability to

obtain medical treatment for approximately a year because he had to wait for his

worker's compensation case manager to approve such treatment.

48.     As well, Dr. Emad insisted that the Plaintiff was noncompliant with physical

therapy despite notations that he was in a lot of pain and despite his history of having

undergone several rounds of physical therapy.

49.     Dr. Emad also focused on 'self-limiting' behaviors noted in the 2018 FCE

report regarding the Plaintiff, despite the report also noting that such behavior could

be caused by fear or other psychosocial factors.

50.     In a signed, supplemental declaration, Dr. Ross explained that the following

factors provided reasonable support for the Plaintiff's alleged, 'self-limiting'

behavior: two (2) major, unexpected back injuries which occurred during work, repeated, painful sessions of physical therapy, and two (2) major back surgeries.

51.     At the same time he attempted to discredit the Plaintiff based on notations in his physical therapy records and FCE report, Dr. Emad admitted that the Plaintiff's reports of severe pain were credible, which made it unreasonable for him to try and support his opinions based on the issues he noted from the FCE and physical therapy records.

52.     In his supplemental declaration, Dr. Ross pointed out the Plaintiff's abnormal physical examination findings following his second lumbar surgery and his orthopedist's discussion with him regarding undergoing a third surgery to relieve his unrelenting pain as support for his ongoing difficulties despite extensive treatment.

53.     Given his expertise as an occupational medicine physician, Dr. Ross also noted common issues worker's compensation cases can present with disability claims, particularly with FCE's like the Plaintiff's, given some of the formalities associated with such evaluations and the failure to account for genuine work restrictions and limitations.

54.     Dr. Ross noted the conflict with comments by the Plaintiff's orthopedist two (2) months before the Plaintiff's FCE, specifically, his notations that the Plaintiff felt miserable. Yet, the FCE findings shortly thereafter essentially claimed the Plaintiff could return to full-time work.

55.     Dr. Ross also noted that Dr. Emad's use of FCE findings from so long ago to the exclusion of considering more recent medical findings was problematic, given the recurring degeneration clearly shown by the Plaintiff's diagnostic tests.  Dr. Ross emphasized that the Plaintiff's condition was a continuation of degenerative issues dating back to 2008.

56.     In response to Dr. Ross' supplemental declaration, Prudential sought additional medical opinions from another physician consultant, Philip Marion, M.D. Prudential claimed that Dr. Emad was not available to provide additional opinions.

57.     Dr. Marion has a long history of rendering inconsistent opinions regarding disability claimants and, also, opinions which do not consider claimants' pain. He has admitted while being deposed under oath that he does not question a patient's pain and he has no idea or understanding how much pain the patient experiences.

58.     Despite Dr. Marion not considering pain a relevant factor in a disability claim, Prudential accepted his opinions and produced this information to the Plaintiff for his response.

59.     In a letter dated April 5, 2021, the Plaintiff pointed out untrue assertions by Dr. Marion, particularly his conclusion that the Plaintiff's September 2018 MRI and his January 2021 MRI yielded similar findings. The Plaintiff provided the following side by side comparison clearly showing that this was untrue:

**2018**                                    **2021**

| | |
|---|---|
| L3-4-assymmetric disc bulge on the left | L3-4: disc desiccation, high signal annular fissure, central and left paracentral disc protrusion causing thecal sac deformity and<br><br>**compressing the left L4 nerve root** in its lateral recess |
| L4-5 – epidural fibrosis on the left | L4-5: disc desiccation, facet arthropathy, **moderate left-sided neuroforaminal stenosis at the L4-nerve root level** |
| L5-S1 – central disc bulge | L5-S1: disc desiccation, high signal annular fissure, broad-based disc bulge at lumbo-sacral junction, **moderate left-sided foraminal stenosis at L5 nerve root level** |

60.     The Plaintiff also pointed out that Dr. Marion mentioned his left-sided neuroforaminal stenosis at L4-L5 and L5-S1 "without associated thecal deformity or nerve root compression," yet he failed to mention the nerve root compression noted at L3-L4.

61.     At the time the Plaintiff submitted his response to Dr. Marion's opinions, it had been approximately sixty-nine (69) days since his initial appeal was submitted. Prudential had provided no reasonable basis under the claim procedure regulations for extending the appeal decision past forty-five (45) days.

62.     Rather, it unnecessarily delayed sending Dr. Emad's report to the Plaintiff and it delayed the appeal decision further by obtaining different opinions from yet another physician consultant after the Plaintiff submitted his response to Dr. Emad's opinions.

63.     Additionally, after the Plaintiff submitted his response to Dr. Marion's opinions on April 5, 2021, Prudential sought further adverse opinions, specifically, a vocational report which it provided to the Plaintiff for the first time, on April 22, 2021, eighty-six (86) days after the Plaintiff's initial submission of his appeal and well after the claim had already been deemed exhausted.

64.     Essentially, the vocational evaluation produced by Prudential adopted the opinions of Dr. Emad and Dr. Marion, assuming the Plaintiff could return to work and thus, listing jobs ranging from a light to medium duty.

65.     Interestingly, this evaluation differed from the evaluation Prudential based its termination decision on, in that it listed jobs falling in the medium range, while the previous vocational evaluation Prudential obtained listed jobs in the sedentary to light duty range.

66.     The policy contains an earnings qualifier, which makes clear, given the Plaintiff's pre-disability annual income of almost $100,000, that he would have to engage in competitive, demanding employment with a return to work.

67.     The Plaintiff sent a letter dated April 30, 2021 to Prudential via facsimile, advising that the vocational evaluation was based on the flawed opinions of Prudential's physician consultants and therefore, it did not take into account the Plaintiff's true restrictions and limitations.

68.   Further, the Plaintiff's previous response to the medical opinions of Prudential's physician consultants sufficed to refute the vocational opinions.

69.   The entire claims handling process by Prudential has been adversarial and a show of unfair gamesmanship, particularly, Prudential failing to rectify some of the discrepancies in Dr. Marion's report as fiduciary of the policy and, instead, ascribing to the antagonistic way Dr. Marion responded to the Plaintiff's April 5, 2021 submission.

70.   The Plaintiff's efforts to explain to Prudential the nature and limitations of his condition have continued to be ignored, and Prudential has chosen to continue to require that the Plaintiff facilitate its efforts to delay the appeal decision in order to gather further adverse evidence to support its efforts to deny his appeal.

71.   Because Prudential delayed its appeal decision without a legally permissible reason for doing so, the medical and vocational opinions that were obtained untimely should not be considered part of the claim record.

72.   As well, any adverse decisions of the claim by Prudential also should not be considered since the claim is deemed exhausted.

73.   Prudential failed to show improvement in the Plaintiff's condition, particularly his debilitating pain.

74.     Prudential also failed to state why the Plaintiff's extensive medical history and the medical evidence, (which included recent diagnostic results of recurring degeneration), was insufficient to show the debilitating nature of his condition.

75.     Prudential failed to state how the Plaintiff could sustain gainful employment while managing severe pain.

76.     It also failed to state how the Plaintiff's ability to concentrate and focus would not be significantly impaired by his ongoing, chronic pain.

77.     The Plaintiff has exhausted all administrative remedies and/or further efforts by the Plaintiff to exhaust remedies would be futile.

## COUNT ONE

74.     The Plaintiff incorporates by reference all previous paragraphs of this Complaint as if set out in full.

75.     This Count is brought regarding the Plaintiff's long-term disability policy under 29 U.S.C. § 1132(a)(1)(B) and seeks to recover benefits, damages, and attorney's fees as may be recoverable under this code provision and 29 U.S.C. § 1132(g).  The Plaintiff seeks to enforce his rights under the long-term disability plan in question.  This plan is an employee benefit plan that appears to be regulated by the Employee Retirement Income Security Act (hereafter ERISA), 29 U.S.C. § 1001 *et seq.*

76.    On or around July 31, 2020, Prudential wrongfully and in violation of its

obligations under ERISA denied long-term disability benefits to the Plaintiff.

Prudential has continued to deny benefits to the Plaintiff since that time.  Prudential

has failed to conduct a full and fair review of this claim.

**WHEREFORE,** the Plaintiff demands judgment against Prudential as

follows:

(a)    For a *de novo* review of this claim;

(b)    For the sum of all past due long-term disability benefits;

(c)    For reinstatement of the Plaintiff's claim to all present and

future long-term disability benefits under the Plan;

(d)    For an award of attorney's fees;

(e)    For interest on all past due benefits;

(f)    For such other further or different relief as may be just and

proper under 29 U.S.C. § 1132(a)(1)(B) including surcharge

damages as allowed by law.

Ariel S. Blocker
(ASB-0090-Z82A)

Attorney for the Plaintiff
Robert Snodgrass
The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL  35402
Ph. (205) 343-1771
Fax (205) 343-1781
ariel@erisacase.com


**Plaintiff's Address:**
Robert Snodgrass
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL  35402

**Defendant's Address:**
The Prudential Insurance Company of America
c/o C T Corporation System
Agent for Service of Process
2 North Jackson Street, Suite 605
Montgomery, AL 36104